IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 9, 2022 Session

**DEANGELO MONTEZE MOODY v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2009-D-3252     Mark J. Fishburn, Judge**
_____

**No. M2021-00605-CCA-R3-ECN**
_____

The Petitioner, Deangelo Monteze Moody, appeals the denial of his petition for writ of error coram nobis and the summary dismissal of his amended petition for post-conviction relief.  Based on our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR. and JILL BARTEE AYERS, JJ., joined.

Manuel Benjamin Russ, Nashville, Tennessee, for the appellant, Deangelo Monteze Moody.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Senior Assistant Attorney General; Glenn. R. Funk, District Attorney General; and Brian Ewald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On April 25, 2009, the Petitioner was involved in a Nashville drive-by shooting directed at two pedestrians, Christopher Bridges and Deandre Williams, that resulted in the death of a sixteen-year-old girl inside her home.  Three other individuals with the Petitioner when the shooting occurred were the Petitioner's two co-defendants, Martez D. Matthews and Lorenzo Ortago Thomas, II, and the younger half-brother of the Petitioner and Co-Defendant Thomas, Quontez Caldwell.  The Petitioner and his co-defendants were indicted

for first degree felony murder committed during the attempt to perpetrate a first degree premeditated murder and employing a firearm during the commission of a dangerous felony. Co-Defendant Thomas' case was severed, and he ultimately pled guilty to second degree murder. The Petitioner and Co-Defendant Matthews were tried together before a Davidson County Criminal Court jury, and each was convicted of first degree murder and sentenced to life imprisonment. This court affirmed the Petitioner's conviction on appeal, and our supreme court denied his application for permission to appeal. *State v. Deangelo M. Moody and Martez D. Matthews*, No. M2011-01930-CCA-R3-CD, 2013 WL 1932718, at *1 (Tenn. Crim. App. May 9, 2013), *perm. app. denied* (Tenn. Oct. 17, 2013).

One of the State's main witnesses at the Petitioner's trial was Mr. Caldwell, who initially disavowed any knowledge of the shooting but eventually gave a statement to police in which he divulged that the Petitioner and his co-defendants shot at the pedestrians because they held a grudge against Mr. Bridges, whom they knew by the nickname "C. Trigger." *Id.* at *3-4. Our direct appeal opinion provides the following summary of Mr. Caldwell's trial testimony:

> Quontez Caldwell testified that [the Petitioner] and Ort[a]go Thomas are his half[-]brothers through their father, but he only became acquainted with them a short time prior to this incident. Mr. Caldwell stated that on April 25, 2009, [the Petitioner] and [Co-Defendant] Thomas picked him up from his grandmother's house in [the Petitioner's] vehicle. He identified [the Petitioner's] vehicle from an exhibit photograph. In addition to his half-brothers, two other males whom he did not know were in the vehicle. He identified [Co-Defendant] Matthews in the courtroom as one of the other passengers in the vehicle. Mr. Caldwell stated that as they drove down Chesapeak Drive, the people in the car saw "somebody they had a beef with [sic][,] and they shot at them." He recalled that [Co-Defendant] Thomas said, "'There go [sic] somebody we beefin' with [sic].'" The driver then turned the vehicle around and drove back up Chesapeak Drive. He said that [the Petitioner, Co-Defendant Matthews] and [Co-Defendant] Thomas began shooting at a person he knew as "C. Trigger." Mr. Caldwell did not recall having previously testified that [Co-Defendant] Matthews had a 9mm pistol, that [the Petitioner] had a ".45 or .40," or that [Co-Defendant] Thomas had a "38 revolver," but he acknowledged that if he had previously so testified, then it was the truth. He stated that neither he nor the driver had a weapon that day. After the shooting, the men dropped Mr. Caldwell off in the middle of the street. He said that he did not speak with appellants about the shooting after it happened.

Mr. Caldwell stated that the police attempted to interview him. The first two times they attempted to speak with him, he told them that he did not know anything about what happened because he just "didn't want to tell them nothing [sic]." Mr. Caldwell denied being a member of the Hoover Deuce Crips. He denied testifying to being a member in July 2009 and said that if his being a member of the Crips was reflected in his statement, it was not the truth.

On cross-examination, Mr. Caldwell denied that a detective with MNPD brought him in for questioning because he had received information that Mr. Caldwell had claimed that he killed the victim. He further denied getting a new "teardrop tattoo" on his face. Mr. Caldwell did not recall telling the detective that he was anywhere near Chesapeak Drive, that he was with someone named "T.O.," that he was in a Chevrolet Impala, or that he did not know the color of the Impala. He stated that he did not know [the Petitioner's] real name and that he only knew his father by the name "Tango."

Mr. Caldwell admitted that he spoke with another detective a few weeks later but denied that he changed his story about being in an Impala with T.O. Mr. Caldwell admitted that [the Petitioner] picked him up and then proceeded to pick up another person, at which time the other person began driving the vehicle. He remembered seeing "C. Trigger" and stated that "guns were pulled[,] and they started shooting." In a subsequent interview with Kathy Morante, an assistant district attorney, Mr. Caldwell denied any knowledge of his brothers' having problems with "C. Trigger" and stated, "I didn't know they had no [sic] beef with him." He testified that his problem with "C. Trigger" was "[s]omething about . . . some child issues" and that it was not significant. Mr. Caldwell denied that the "child issues" concerned his child's mother and could not remember stating that there was bad blood between him and "C. Trigger" or indicating that "C. Trigger" had tried to do him harm in the past. He declined the opportunity to review the transcript of his statement.

*Id.*

Kathy Morante, the Davidson County Assistant District Attorney who was assigned to handle juvenile transfers, testified that Mr. Caldwell, who had a pending attempted murder charge in an unrelated case, was given use immunity for his testimony at the Petitioner's trial. *Id.* at *4.

In 2014, the Petitioner filed a petition for post-conviction relief in which he raised a claim of ineffective assistance of counsel. Among his allegations were that trial counsel failed to interview and/or call important defense witnesses, including Co-Defendant Thomas and Mr. Moody. At the evidentiary hearing, Co-Defendant Thomas testified that he told his lawyer, his family, and the Petitioner's family that the Petitioner did not have a gun and was not responsible for the victim's death. Co-Defendant Thomas further testified "that he wanted to testify at the Petitioner's trial that he was the one responsible for the victim's murder, but no one would let him take responsibility." *Deangelo Moody v. State*, No. M2015-02424-CCA-R3-PC, 2017 WL 829820, at *5-7 (Tenn. Crim. App. Mar. 2, 2017), *perm. app. denied* (Tenn. June 9, 2017).

Mr. Caldwell did not testify at the post-conviction evidentiary hearing, but the Petitioner testified that although he asked trial counsel to investigate the alleged bragging statements Mr. Caldwell made at his high school about the murder, trial counsel failed to do so. *Id.* at *7. The Petitioner acknowledged that the police had investigated and "could not find any witnesses who heard Mr. Caldwell bragging about the murder." *Id.*

The post-conviction court granted the petition "based on a finding that trial counsel was ineffective for failing to interview [Co-Defendant] Thomas or call him as a witness at trial." *Id.* at *7. The post-conviction court found that trial counsel's deficient performance in not interviewing or calling Co-Defendant Thomas as a witness prejudiced the defense because there was "'no way to know'" how the jury would have reacted to Co-Defendant Thomas' testimony that the Petitioner was unaware of his co-defendants' intentions to shoot. *Id.* At *10. "The court denied relief based on all other claims raised by the [P]etitioner." *Id.* at *7.

Following the State's appeal, this court reversed the judgment of the post-conviction court and reinstated the judgment of conviction, and our supreme court denied the Petitioner's application for permission to review. *Id.* at *1. In reversing the judgment of the post-conviction court, we first found that the Petitioner failed to show deficient performance because, among other things, the evidence preponderated against the post-conviction court's finding that trial counsel was aware that Co-Defendant Thomas wanted to testify on the Petitioner's behalf. We further found that, even if trial counsel knew of Co-Defendant Thomas' proposed testimony that the Petitioner was unaware of his co-defendants' intentions, such testimony would likely have been inadmissible as speculative. *Id.* at *10. We additionally observed that the post-conviction court employed the wrong standard of review in finding that counsel's alleged deficiency resulted in prejudice to the case. We concluded that the Petitioner could not show prejudice under the correct standard of review:

Applying the correct standard, we cannot conclude that there is a reasonable probability that the result of the trial would have been different had [Co-Defendant] Thomas testified. [Co-Defendant] Thomas testified at the post-conviction hearing that his testimony essentially would have been that the [P]etitioner did not have or fire a weapon, but that evidence was already presented to and apparently accepted by the jury in acquitting the [P]etitioner of the weapon charge. The post-conviction court even noted that [Co-Defendant] Thomas' testimony "mirror[ed] the jury's verdict that Petitioner was not a shooter."

Even with [Co-Defendant] Thomas' testimony, the evidence established that the [P]etitioner was in the car at the time the shots were fired and the car was registered to his mother. The evidence also indicates some awareness on the [P]etitioner's part of what was going to happen considering Quontez Caldwell's testimony that, while they were in the car, one of the passengers said, "There go [sic] somebody we beefin' with [sic]," and the driver made a U-turn to go back toward the individuals. In light of [Co-Defendant] Thomas' limited proposed testimony that the [P]etitioner was not the shooter, the fact that the State prosecuted the [P]etitioner under a theory of criminal responsibility and the fact that [Co-Defendant] Thomas' testimony would have been impeached support a finding that there was no reasonable probability that the result of the trial would have been different had [Co-Defendant] Thomas testified.

*Id.* at *10. In the judgment that accompanied the opinion, we wrote in pertinent part that "the judgment of the post-conviction court is reversed, and the case remanded to the Criminal Court for Davidson County for further proceedings consistent with this court's opinion and for collection of the costs accrued below."

In November 2019, the Petitioner filed a pro se petition for writ of error coram nobis on the basis of newly discovered evidence of Mr. Caldwell's recantation of his trial testimony. He attached to the petition Mr. Caldwell's September 24, 2019, affidavit in which he stated that police officers coerced him into providing the false statement that the Petitioner and his co-defendants shot at Mr. Bridges because they held a grudge against him. Following the appointment of counsel, on January 10, 2020, the Petitioner filed another petition for writ of error coram nobis based on the alleged newly discovered recanted trial testimony of Mr. Caldwell. The Petitioner asserted that he had not had any contact with Mr. Caldwell in the years following his trial until September 2019 when Mr. Caldwell unexpectedly sent him an unsolicited letter with information about his coerced and perjured trial testimony. The Petitioner argued that he was entitled to due process tolling of the one-year statute of limitations because he "was unable, regardless of

diligence, to present this information to the Court in a more timely manner because it did not exist until quite recently."

On February 18, 2020, the Petitioner, through his appointed counsel, filed an amended petition in which he alleged as an additional ground for error coram nobis relief an alleged *Brady* violation surrounding Co-Defendant Thomas' claim that he had informed his trial counsel and family that the Petitioner was not involved in the shooting. The Petitioner asserted that the prosecutor knew that Co-Defendant Thomas' testimony would be favorable to the defense, but the State failed to disclose that information to the Petitioner's trial counsel.

The State responded, *inter alia*, that the petition was barred by the one-year statute of limitations, that the Petitioner failed to provide a legitimate basis for due process tolling, and that a petition for writ of error coram nobis is not the proper vehicle in which to raise an alleged *Brady* violation.

The Petitioner presented two witnesses at the error coram nobis hearing: Mr. Caldwell and Co-Defendant Thomas. Mr. Caldwell testified that the police coerced him into giving the third, false statement that formed the basis for his trial testimony against the Petitioner. He said he was only thirteen- or fourteen-years-old, was not allowed to have his grandmother with him during the interview, and was frightened of the police officers, who threatened that he would be charged for the crime. He said that the officers "were suggesting throwing out hints" about what he should include in his fabricated statement.

Mr. Caldwell further testified that, contrary to his statement and his trial testimony, the Petitioner did not shoot a gun. He said that he was traveling in "T.O."'s vehicle with the Petitioner, Co-Defendants Thomas and Matthews, and a fourth individual that he did not know when they passed someone walking down the street. Someone in the vehicle mentioned that they knew the individual, and the driver turned the car around and "some shooting happened." Mr. Caldwell then stated that it was Co-Defendant Thomas who shot at the pedestrian. He said that the Petitioner was not driving and did not direct Co-Defendant Thomas to shoot. He could not recall that anyone in the vehicle mentioned a grudge against the pedestrian, and he had no idea why Co-Defendant Thomas began shooting at him. He could not recall where the Petitioner was seated in the vehicle when the shooting occurred, but he thought that he might have been in the back seat.

Mr. Caldwell identified the undated and unsigned letter he sent to the Petitioner, which was admitted as an exhibit to the hearing. He testified that he was incarcerated in a juvenile facility for four years after the shooting, was "on the streets" for some time following his release from the juvenile facility, and was arrested and jailed in 2014. When asked why he waited eleven years to contact the Petitioner about his false trial testimony,

he at first said it was because he "wasn't really thinking about it" during the time he was on the streets. He then said that it was because he was not incarcerated in the penitentiary until 2016. When asked why it took him three years after he was sent to the penitentiary to contact the Petitioner, he explained that he was "fresh in the penitentiary" and was initially unable to "figure out where [the Petitioner] was." However, he eventually learned the Petitioner's location and sent him the letter.

On cross-examination, Mr. Caldwell acknowledged that he had adult convictions for attempted aggravated burglary, two counts of felon in possession of a firearm, and attempted second degree murder, as well as various juvenile adjudications. He admitted that he denied any involvement or knowledge of the shooting in his first statement on April 30, 2009, and at the beginning of his second statement on June 12, 2009, before he eventually gave the June 18, 2009 statement that implicated the Petitioner. He acknowledged he signed the use immunity agreement before giving his third statement but claimed he did not understand it. He said he did not remember having a lawyer present.

Mr. Caldwell insisted that the police coerced him into making the third statement by "cursing" and talking "aggressively" to him. He identified his voice on the audio recordings of his second and third interviews, and the recordings were admitted as exhibits to the hearing. Mr. Caldwell acknowledged that the recordings reflected that he was advised of his *Miranda* rights at the beginning of the interviews, and that his lawyer was present for his third statement. He stated that the coercion of which he complained took place "[w]ay before the tape recording came on."

Mr. Caldwell acknowledged that he identified the Petitioner as one of the shooters not only in the third statement and at the Petitioner's trial, but also in a juvenile court proceeding. He said, however, that he was lying during those proceedings. He stated that he did not attempt to contact the Petitioner to recant his testimony until he was incarcerated in the penitentiary, where it was possible to "find out things like that, where is this person, people and things." He then said that it took three years to locate the Petitioner because "[his] people were doing it from the street. And they didn't know where he was at first until 2019." When asked to identify his "people," he said that they were "just family members" and that he could not remember which one ultimately located the Petitioner. When asked about the line in his letter to the Petitioner in which he expressed his willingness to help the co-defendants and what kind of help he thought he could provide to Co-Defendant Thomas, whom he had just identified as the sole shooter, he replied that he would help the co-defendants with anything in which they needed help. He denied that the help he was willing to provide included lying for them.

On redirect examination, Mr. Caldwell explained that he was motivated to contact the Petitioner about his false trial testimony after he experienced the conditions at the

penitentiary himself, which caused him to feel remorseful for the role he had played in the Petitioner's conviction and incarceration.

In response to questions from the trial court, Mr. Caldwell testified that he did not tell his lawyer that the police officers coerced him into making the third statement. He said the officers allowed his grandmother to come with him to the police station but would not allow her to be present for his statement. According to the Petitioner, the only advice his grandmother gave him was to tell the truth: "You know how older people are, they say tell the truth, tell the truth, you know, but she didn't suggest no answers or nothing like that."

Co-Defendant Thomas testified that one or two weeks before the Petitioner's trial he told his lawyer that he intended to testify that the Petitioner did not have a gun and was not involved in the shooting. He said that his lawyer did not advise him one way or the other with respect to his proposed testimony but even had she advised against it, he would have still given the same testimony. He had no idea if his lawyer informed the prosecutor of his proposed testimony. However, he was not called as a witness for the State, despite having been subpoenaed.

On cross-examination, Co-Defendant Thomas acknowledged that he had previously given the following testimony in 2014 and 2015 in Co-Defendant Matthews' post-conviction evidentiary hearing and at the Petitioner's post-conviction evidentiary hearing: that the only two individuals in the vehicle who fired a weapon were himself, who fired into the air, and Mr. Caldwell, who fired in the direction of Mr. Bridges. He testified that his family members were in communication with both the Petitioner and himself and that they knew he was willing to testify on the Petitioner's behalf. However, they did not inform the Petitioner because they believed that he and the Petitioner should work out their own problems.

While the parties were awaiting the ruling on the error coram nobis petition, the Petitioner, through counsel, filed what he styled as a "Second Amended Petition for Post-Conviction Relief." As an exhibit to the petition, the Petitioner attached a declaration from Co-Defendant Thomas' trial counsel, Ashley D. Preston, stating that she informed the assistant district attorney of Co-Defendant Thomas' proposed testimony, which, to the best of her recollection, was that the Petitioner neither possessed nor fired a gun nor directed anyone else to fire a gun. [1] Ms. Preston stated that she informed the Petitioner's trial counsel in a separate conversation of Co-Defendant Thomas' proposed testimony, but trial counsel did not ask her to arrange a meeting between trial counsel and Co-Defendant

---

[1] On January 10, 2022, this court entered an order granting the Petitioner's motion to supplement the appellate record with the declaration, which was attached as an exhibit to the amended petition for post-conviction relief.

Thomas or for Co-Defendant Thomas to be called as a witness for the Petitioner at trial. Further, to her knowledge, trial counsel never spoke with or corresponded with Co-Defendant Thomas to determine what, if any, helpful information he could have provided to the Petitioner's defense.

Relying on the "further proceedings" language of this court's judgment in the post-conviction appeal, the Petitioner asserted that his post-conviction case was still pending because the post-conviction court "ha[d] not issued any further Orders either reflecting the Court of Criminal Appeal decision, or ruling on any of the remaining issues." The Petitioner argued that, in addition to considering the previously unaddressed claims in the pro se petition for post-conviction relief, the trial court should reconsider the testimony of Co-Defendant Thomas in light of Co-Defendant Thomas' error coram nobis testimony and Ms. Preston's declaration. The Petitioner argued that such evidence provided the trial court "with the basis, pursuant to the Court of Criminal Appeals remand, to establish that [trial counsel] was, in fact, aware of what Mr. Thomas' testimony would be and the Court's findings were not based on 'pure speculation' about Mr. Thomas' trial testimony."

On May 5, 2021, the trial court issued an order denying the petition for writ of error coram nobis and summarily dismissing the amended petition for post-conviction relief. With respect to the petition for writ of error coram nobis, the court found that Mr. Caldwell was not credible and that the Petitioner failed to show any due process grounds for tolling the statute of limitations based on Co-Defendant Thomas' testimony. Accordingly, the court denied the petition. With respect to the amended petition for post-conviction relief, the court found that the Petitioner's reliance on this court's judgment remanding the case "for further proceedings" was misplaced, and that the Petitioner's post-conviction claims had been fully litigated. Accordingly, the court summarily dismissed the amended petition for post-conviction relief.

## ANALYSIS

### A. Denial of Petition for Writ of Error Coram Nobis

On appeal, the Petitioner does not challenge the summary dismissal of his coram nobis claim surrounding Co-Defendant Thomas' testimony as time-barred. Instead, he contends only that the trial court abused its discretion in denying the petition based on its finding that Mr. Caldwell was not credible. The State responds that the trial court properly denied the petition based on its reasonable determination as fact finder that Mr. Caldwell's recantation was not credible. We agree with the State.

A writ of error coram nobis is an extraordinary remedy by which the court may provide relief from a judgment under only narrow and limited circumstances. *State v.*

*Mixon*, 983 S.W.2d 661, 666 (Tenn. 1999). The writ of error coram nobis is codified in Tennessee Code Annotated section 40-26-105, which provides in pertinent part:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Tenn. Code Ann. § 40-26-105(b). "The decision to grant or deny a petition for writ of error coram nobis on its merits rests within the trial court's sound discretion." *Payne v. State*, 493 S.W.3d 478, 484 (Tenn. 2016).

A trial court should grant a writ of error coram nobis on the basis of newly discovered recanted testimony only if the following conditions are met:

> (1) the trial court is reasonably well satisfied that the testimony given by the material witness was false and the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, or was surprised by the false testimony, or was unable to know of the falsity of the testimony until after the trial; and (3) the jury might have reached a different conclusion had the truth been told.

*State v. Ratliff*, 71 S.W.3d 291, 298 (Tenn. Crim. App. 2001) (citing *Mixon*, 983 S.W.2d at 673 n.17).

In its order denying relief, the trial court provided the following in support of its finding that Mr. Caldwell's recantation was not credible: the recording of the third interview reflected that Mr. Caldwell's attorney was present and explained use immunity to him; there was no indication in the recordings of any coercion or threats; the account Mr. Caldwell provided in the third statement remained consistent throughout his trial testimony; the third statement followed the admonishment by Mr. Caldwell's grandmother to Mr. Caldwell to be truthful; Mr. Caldwell's coram nobis testimony that Co-Defendant Thomas was the only shooter was inconsistent with his affidavit in which he stated that he kept his head down during the shooting; and Mr. Caldwell's coram nobis testimony lacked "the kind of details one would expect if truthfully recounting the details of what would be

considered a memorable event."  The trial court also found Mr. Caldwell's explanation for why it took him so long to locate the Petitioner to be "implausible" and "highly suspect."

We find no abuse of discretion in the denial of the petition.  It is not the province of this court to reweigh or reevaluate credibility determinations made by the trier of fact.  *See Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009) ("Appellate courts do not reassess credibility determinations."); *Newsome v. State*, 995 S.W.2d 129, 135 (Tenn. Crim. App. 1998) ("[T]his court will not second guess the trial court's evaluation of the witnesses' credibility.").  We. therefore, affirm the denial of the petition for writ of error coram nobis.

### B.  Dismissal of Petition for Post-Conviction Relief

The Petitioner contends that the trial court also erred by summarily dismissing the amended petition for post-conviction relief.  The Petitioner argues that the trial court, by not reopening the post-conviction proceedings to rule on the unadjudicated issues in the Petitioner's pro se petition, or to reconsider the additional proof of trial counsel's knowledge of Co-Defendant Thomas' proposed trial testimony, "ignored the clear guidance of this Court."  In support, the Petitioner points to the "remanded for further proceedings consistent with this opinion" language of the judgment entered in conjunction with our post-conviction opinion.  The Petitioner argues that, had this court "meant to instruct the post-conviction court otherwise, or more explicitly, it would have done so and the absence of such clear language, . . .  permits additional litigation."

We respectfully disagree.  The Petitioner's reading of the boilerplate language in our post-conviction judgment is strained and unreasonable.  It is clear from our opinion that the only outcome of the State's appeal consisted of our reversal of post-conviction relief and reinstatement of the judgment of conviction.  There is nothing in our opinion to even remotely suggest that we intended to remand to the post-conviction court for a potential reopening of the proof or for reconsideration of issues that the Petitioner either failed to present at the evidentiary hearing, or that the post-conviction court denied after the hearing.  "A ground for relief is waived if the petitioner . . . failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented[.]"  Tenn. Code Ann. § 40-30-106(g).  A ground for relief is considered previously determined if a court has ruled on the merits after a full and fair hearing at which the petitioner was afforded the opportunity to call witnesses and present other evidence, "regardless of whether the petitioner actually introduced any evidence."  Tenn. Code Ann. § 40-30-106(h).

Furthermore, the Petitioner could have raised the post-conviction court's denial of his other grounds for post-conviction relief at the same time that we addressed the State's appeal of the post-conviction court's grant of post-conviction relief.  *See* Tenn. R. App. P.

27(b) (". . . If appellee is also requesting relief from the judgment, the brief of the appellee shall contain the issues and arguments involved in his request for relief as well as the answer to the brief of the appellant."). Because the Petitioner failed to raise those other claims before this court when he had the opportunity, he has waived them in this appeal. "[A] defendant's failure to raise issues in a first appeal results in a waiver of those issues in a subsequent appeal." *Charles Bradford Stewart v. State*, No. M2015-02449-CCA-R3-PC, 2017 WL 2645651, at *7 (Tenn. Crim. App. June 20, 2017), *perm. app. denied* (Tenn. Oct. 4, 2017). We, therefore, affirm the summary dismissal of the amended petition for post-conviction relief.

<u>CONCLUSION</u>

Based on our review, we affirm the judgment of the trial court denying the petition for writ of error coram nobis and dismissing the amended petition for post-conviction relief.

_____
JOHN W. CAMPBELL, SR. JUDGE

- 12 -